


DAVID C. SHONKA
Acting General Counsel
FAYE CHEN BARNOUW, CA Bar No. 168631
fbarnouw@ftc.gov
MARICELA SEGURA, CA Bar No. 225999
msegura@ftc.gov
Federal Trade Commission
10877 Wilshire Blvd., Ste. 700
Los Angeles, CA 90024
Tel: (310) 824-4343
Fax: (310) 824-4380

Attorneys for the Plaintiff
Federal Trade Commission




UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

MDK MEDIA INC., a California corporation also doing business as SE VENTURES, GMK COMMUNICATIONS, and EMG;

MAKONNEN DEMESSOW KEBEDE, individually and as an officer and owner of MDK Media Inc.;

TENDENCI MEDIA LLC, a California limited liability company;

SARAH ANN BREKKE, individually and as a member of Tendenci Media LLC;

MINDKONTROL INDUSTRIES LLC, a California limited liability company;

CHRISTOPHER THOMAS DENOVELLIS, individually and as a member of Mindkontrol Industries LLC;

ANACAPA MEDIA LLC, a California limited liability company;

WAYNE CALVIN BYRD II, individually and as a member of Anacapa Media LLC;

Case No. CV14-5099 JFW-SHx

COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF



BEAR COMMUNICATIONS LLC, a California limited liability company;

JAMES MATTHEW DAWSON, individually and as a member of Bear Communications LLC;

NETWORK ONE COMMERCE INC., a Nevada corporation; and

CASEY LEE ADKISSON, individually and as an officer and owner of Network One Commerce Inc.,

Defendants.

Plaintiff, the **Federal Trade Commission** ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). As explained herein, Defendants have engaged in a widespread scheme to place unauthorized third-party charges on consumers' mobile phone bills, a harmful and illegal practice known as "cramming."

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (c)(1) and (2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b) and 56(a)(2)(A).

**DEFENDANTS**

6. Defendant **MDK Media Inc.** ("MDK") is a California corporation with its principal place of business in Gardena, California. It also does business as "SE Ventures," "GMK Communications," and "EMG." MDK transacts or has transacted business in this District and throughout the United States.

7. Defendant **Makonnen Demessow Kebede** ("Kebede") is the sole owner and officer of MDK. At all times material to this complaint, acting alone or in concert with others, Kebede formulated, directed, controlled, had the authority to control, or participated in the acts and practices of MDK, Tendenci, Mindkontrol, Anacapa, Bear, and Network One. This includes incorporating MDK; setting up and managing its bank accounts, domain names, and websites; serving as sole signatory on and managing MDK's bank accounts; recruiting the other Defendants to operate as content providers; managing MDK's short code campaigns; participating in the management of the other Defendants' short code campaigns; and directing and/or participating in the other acts and practices set forth in this Complaint. Kebede resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

8. Defendant **Tendenci Media LLC** ("Tendenci") is a California limited liability company with its principal place of business in Los Angeles, California.

Tendenci transacts or has transacted business in this District and throughout the United States.

9. Defendant **Sarah Ann Brekke** ("Brekke") is the owner and sole member of Tendenci. At all times material to this complaint, acting alone or in concert with others, Brekke formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Tendenci. This includes forming Tendenci as a corporate entity; arranging for and managing its mail drop addresses; serving as sole signatory on and managing Tendenci's bank accounts; registering and managing Tendenci's domain names; managing Tendenci's websites, short codes, and short code campaigns; and directing and/or participating in the other acts and practices set forth in this Complaint. Defendant Brekke resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

10. Defendant **Mindkontrol Industries LLC** ("Mindkontrol") is a California limited liability company with its principal place of business in San Francisco, California. Mindkontrol transacts or has transacted business in this District and throughout the United States.

11. Defendant **Christopher Thomas DeNovellis** ("DeNovellis") is the owner and sole member of Mindkontrol. At all times material to this complaint, acting alone or in concert with others, DeNovellis formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Mindkontrol. This includes forming Mindkontrol as a corporate entity; serving as sole signatory on and managing its bank accounts; managing its short codes and short code campaigns; and directing and/or participating in the other acts and practices set forth in this Complaint. DeNovellis resides in the Northern District of California, and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

12. Defendant **Anacapa Media LLC** ("Anacapa") is a California limited liability company with its principal place of business in Los Angeles, California. Anacapa transacts or has transacted business in this District and throughout the United States.

13. Defendant **Wayne Calvin Byrd II** ("Byrd") is the owner and sole member of Anacapa. At all times material to this complaint, acting alone or in concert with others, Byrd formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Anacapa, Tendenci, and Bear. This includes forming Anacapa as a corporate entity and participating in the formation of Tendenci as a corporate entity; arranging for Anacapa's mail drop addresses; serving as sole signatory on and managing Anacapa's bank accounts; registering its domain names; managing its websites, short codes, and short code campaigns; and directing and/or participating in the other acts and practices set forth in this Complaint. Defendant Byrd resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

14. Defendant **Bear Communications LLC** ("Bear") is a California limited liability company with its principal place of business in Los Angeles, California. Bear transacts or has transacted business in this District and throughout the United States.

15. Defendant **James Matthew Dawson** ("Dawson") is the owner and sole member of Bear. At all times material to this complaint, acting alone or in concert with others, Dawson formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Bear, Tendenci, and Anacapa. This includes forming Bear as a corporate entity; participating in the formation of Tendenci and Anacapa as corporate entities; arranging for Bear's mailing addresses; serving as sole signatory on and managing Bear's bank accounts; registering Bear's domain names; managing Bear's domain names and

participating in the management of Tendenci's domain names; managing Bear's short codes and short code campaigns; and directing and/or participating in the other acts and practices set forth in this Complaint. Dawson resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

16. Defendant **Network One Commerce Inc.** ("Network One") is a Nevada corporation with its principal place of business in San Diego, California. Network One transacts or has transacted business in this District and throughout the United States.

17. Defendant **Casey Lee Adkisson** ("Adkisson") is the sole owner and officer of Network One. At all times material to this complaint, acting alone or in concert with others, Adkisson formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Network One and Tendenci. This includes forming Network One as a corporate entity; arranging for its mail drop address; serving as sole signatory on and managing its bank accounts; managing its short codes and short code campaigns; participating in Tendenci's short code campaigns; and directing and/or participating in the other acts and practices set forth in this Complaint. Adkisson resides in the Southern District of California and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**COMMERCE**

18. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' ACTIVITIES**

19. Since at least 2012, MDK, Tendenci, Mindkontrol, Anacapa, Bear, Network One, and their principals Kebede, Brekke, DeNovellis, Byrd, Dawson, and Adkisson (collectively, "Defendants") have operated a scam in which they

have "crammed" unauthorized charges onto consumers' mobile phone bills. Many consumers have paid their mobile phone bills without ever noticing these charges; others have paid and then unsuccessfully disputed the third-party charges without obtaining a refund; still others have disputed the charges and succeeded in having them removed only after substantial effort. Defendants have made millions of dollars by engaging in these deceptive and unfair acts and practices.

**The Placement of Third-Party Charges on Mobile Phone Bills**

20. Text messages that are sent as "Premium SMS" texts are billed to the recipient at a higher rate than the standard text message charge (also known as "Short Message Service" or "SMS") and/or are sent as part of a subscription to a service for which there is a recurring monthly charge. A number of wireless phone carriers have allowed third-party merchants, called "content providers," to use the carriers' Premium SMS text message and billing infrastructures to deliver digital goods or services (e.g., daily horoscopes or romance tips) to their customers' mobile phones, and to collect payment for these goods and services through their customers' mobile phone bills.

21. To access a wireless phone carrier's Premium SMS text message and billing infrastructure, a content provider must first obtain authorization from the wireless phone carrier to bill consumers for a specific good or service (often referred to as a "program") under a five- or six-digit number called a "short code." Taken together, the short code and program are referred to as the content provider's "short code campaign." The wireless phone carrier allows content providers to bill consumers on its Premium SMS billing platform through these short code campaigns. This arrangement is facilitated through a third-party intermediary known as an "aggregator."

22. Under standard industry practice, a legitimate content provider generally requires the consumer to take two affirmative steps to confirm the consumer's intention to purchase the content provider's digital good or service, a

practice known as "double opt-in" verification. For example, a consumer who visits a content provider's web page advertisement and wants to subscribe to the content provider's program may initiate the subscription process by entering his or her mobile phone number on that web page advertisement. The content provider then sends to the consumer's mobile phone a text message which includes a description of the good or service, a four-digit personal identification number, and instructions how to complete the opt-in process. The second opt-in step occurs when the consumer enters the personal identification number back into the same website to confirm his or her intent to subscribe to the content provider's program. This second opt-in step activates the consumer's subscription. The content provider then sends a text message to the consumer to confirm the subscription activation.

23. The content provider sends to the aggregator the mobile phone numbers that it has authorization to bill. The aggregator then determines which wireless carrier is associated with each consumer's mobile phone number and submits the Premium SMS charges to the appropriate wireless phone carrier for placement on the consumer's mobile phone bill. The consumer pays the wireless phone carrier for the Premium SMS charges as part of his or her overall mobile phone bill. The wireless phone carrier sends a portion of this money (net of its fees and any refunds the carrier has made to consumers) to the aggregator. The aggregator then transmits a portion of the money (net of its fees and any refunds the aggregator has made to consumers) to the content provider.

**Defendants' Cramming of Unauthorized Charges onto Consumers' Mobile Phone Bills**

24. The programs that Defendants purportedly sell to consumers consist of subscriptions for periodic text messages sent to consumers' mobile phones that contain entertainment texts such as short celebrity gossip alerts, "fun facts," and horoscopes. Each of Defendants' subscriptions typically costs $9.99 or $14.99 per month and is set to renew automatically every month. Defendants have billed

consumers for these programs on the Premium SMS billing platforms of a number of wireless phone carriers.

25. Unlike legitimate content providers, however, Defendants have placed charges for these services on consumers' mobile phone bills without obtaining the consumers' consent, whether through double opt-in verification or another mechanism.

26. Defendants cram charges on consumers' mobile phone bills in at least two ways. For some consumers, Defendants obtain consumers' mobile phone numbers through deceptive website offers that lead consumers to believe they are entering their mobile phone numbers and other personal information onto the website in order to receive a "freebie" such as a gift card or discount coupon. These "freebies" include a $1,000 Walmart gift card from http://walmart.rewardhubzone.com and a $500 Target gift card from http://target4.net, as well as coupons and other items from websites such as http://www.grandsavingscenter.com, http://free-coupons-everyday.com, http://retailbrandprize.com, http://www.onlinegiftrewards.com, http://www.consumergiftspot.com, http://bestbuyraffle.com, http://www.freegasfairy.com, and http://iphone5.newrewardsdaily.com.

27. Other consumers are billed by Defendants without having had any prior contact with Defendants. In these instances, Defendants begin sending to the consumers' mobile phones unsolicited text messages that many consumers assume have been sent in error. Defendants begin cramming charges on consumers' mobile phone bills contemporaneous with the sending of these unsolicited text messages.

28. Regardless of the mechanism Defendants use to obtain consumers' mobile phone numbers, Defendants misrepresent to wireless phone carriers that consumers to whom they have sent unsolicited text messages have knowingly

subscribed to Defendants' text message subscription service and authorized the placement of Premium SMS charges on their phone bills.

29. These billing practices have harmed consumers. The monthly charges for these subscriptions are often difficult to find in the consumer's mobile phone bill and listed in an abbreviated and confusing form. Many consumers do not notice Defendants' charges included on their bills and pay their bills in full, thus paying the unauthorized charge without realizing it. Further, the charges recur unless and until the consumer takes action to unsubscribe.

30. Those consumers who notice and contest the unauthorized charges have also been harmed. Consumers report that the process of disputing these charges is frustrating and time-consuming. Some consumers have been crammed for multiple months before noticing the charges and, even after significant effort, are unable to obtain a full refund.

31. Wireless phone carriers have suspended or terminated a number of Defendants' short codes because of these billing practices.

32. Despite these sanctions, Defendants have maintained their access to these wireless phone carriers' Premium SMS billing platforms and have continued to place charges on consumers' mobile phone bills. Defendants have accomplished this by, among other things, providing false information to the wireless phone carriers and operating under different names.

**Defendants' Participation and Control**

33. MDK began cramming charges in or around 2010. It ran numerous short code campaigns under the names MDK, GMK Communications, and SE Ventures, which have crammed charges on consumers' mobile phone bills. These campaigns included "Quiz Alert" (on short code 60168), "Love Connection" and "Destiny Horoscope" (both on short code 64651), "Special Secret Lover" (on short code 68514), and "My Phone Beatz" and "The Stars Horoscopes" (both on short code 79597). Kebede and MDK ran these campaigns on AT&T Mobility LLC

("AT&T"); Sprint Spectrum, LP, also d/b/a Sprint PCS ("Sprint"); T-Mobile USA, Inc. ("T-Mobile); and Cellco Partnership also d/b/a Verizon Wireless ("Verizon"). MDK's billing privileges were terminated by Verizon in October 2011, and by AT&T in July 2012. Despite these terminations, MDK continued to cram charges using similar short code campaigns on other wireless phone carriers' Premium SMS billing platforms. MDK's short code campaigns generated over $19 million in revenues for MDK.

34. Kebede and MDK also have recruited other content providers—including Defendants Tendenci, Mindkontrol, Anacapa, Bear, and Network One, and their principals Defendants Brekke, DeNovellis, Byrd, Dawson, and Adkisson—to run short code campaigns and cram charges through the wireless phone carriers' Premium SMS billing platforms. Tendenci, Mindkontrol, Anacapa, Bear, and Network One have generated substantial revenues from their cramming activities and forwarded to MDK a substantial portion. Kebede and MDK have made tens of millions of dollars from these deceptive and unfair business practices. Brekke, Tendenci, DeNovellis, Mindkontrol, Byrd, Anacapa, Dawson, Bear, Adkisson, and Network One retained the remainder as compensation for their role in the scheme.

35. Defendant Tendenci began cramming charges in or around March 2012. Defendants Kebede, Brekke, Byrd, Dawson, and Adkisson directed and/or participated in Tendenci's fraudulent operations, which ran numerous short code campaigns—including "My Phone Beatz" and "Text Groove" (both on short code 25260), "Smart Mobile Quiz" (on short code 70890), and "Texting Tips" (on short code 83016) on T-Mobile, Sprint, and Verizon—and crammed charges onto consumers' mobile phone bills. Verizon terminated Tendenci's billing privileges in July 2012. Despite this termination, Tendenci continued to cram charges using similar short code campaigns on other wireless phone carriers' Premium SMS

billing platforms. Tendenci's short code campaigns generated over $5 million in revenues for Tendenci.

36. Defendant Mindkontrol began cramming charges in or around July 2012. Defendants Kebede and DeNovellis directed and/or participated in Mindkontrol's fraudulent operations, which ran numerous short code campaigns—including "My Eco Portal" and "Your True Fate Horoscopes" (both on short code 71573) on T-Mobile, Sprint, and AT&T—and crammed charges onto consumers' mobile phone bills. These short code campaigns generated over $11 million in revenues for Mindkontrol.

37. Defendant Anacapa began cramming charges in or around July 2012. Defendants Kebede, Byrd, and Dawson directed and participated in Anacapa's fraudulent operations, which ran numerous short code campaigns—including "Mobile Tune Club" (on short code 65815), "Love Match Score" (on short code 54480), and "My Mobile Nine" and "My Cosmic Sign" (both on short code 84653) on T-Mobile, AT&T, and Sprint—and crammed charges on consumers' mobile phone bills. These short code campaigns generated over $22 million in revenues for Anacapa.

38. Defendant Bear began cramming charges in or around October 2012. Defendants Kebede, Dawson, and Byrd directed and participated in Bear's fraudulent operations, which ran numerous short code campaigns—including "Tons of Mobile" (on short code 21446), "Horoscopes Now" and "Ur Astrology" (both on short code 27460), and "Text Fun 4 Phone" (on short code 95899) on Sprint and Verizon—and crammed charges on consumers' mobile phone bills. Verizon temporarily suspended Bear's billing privileges in January 2013. Despite this, Bear continued to cram charges using similar short code campaigns on Sprint's Premium SMS billing platform. Bear's short code campaigns generated over $4 million in revenues for Bear.

39. Defendant Network One began cramming charges in or around May 2013. Defendants Kebede and Adkisson directed and participated in Network One's fraudulent operations, which ran numerous short code campaigns—including "Find Loves Match" (on short code 74881) and "Ringtones Everywhere" (on short code 46806) on Sprint and Verizon—and crammed charges on consumers' mobile phone bills. Network One's short code campaigns generated over $1 million in revenues for Network One.

## VIOLATIONS OF THE FTC ACT

40. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

41. Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

### Deceptive Acts and Practices in Violation of Section 5 of the FTC Act

42. In numerous instances in connection with the sale of Premium SMS services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers are obligated to pay for charges for Defendants' Premium SMS services appearing on consumers' mobile phone bills.

43. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 42 of this Complaint, consumers were not obligated to pay the charges because the consumers did not authorize charges for Defendants' services corresponding to the charges on the bill.

44. Therefore, Defendants' representations as set forth in Paragraph 42 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT II**

**Unfair Billing Practices in Violation of Section 5 of the FTC Act**

45. In numerous instances, Defendants have caused consumers' telephone accounts to be billed without having previously obtained the consumers' express informed consent.

46. Defendants' actions have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

47. Therefore, Defendants' practices as set forth in Paragraph 45 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

**CONSUMER INJURY**

48. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

49. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other such relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, § 53(b), and the Court's own equitable powers, requests that the Court:

A. Award such preliminary and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, a temporary and preliminary injunction, asset freeze, appointment of a receiver, an evidence preservation order, and expedited discovery;

B. Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including, but not limited to, rescission and reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: JUL 1 2014

Respectfully submitted,

David C. Shonka
Acting General Counsel

Faye Chen Barnouw
Maricela Segura
Attorneys for Plaintiff
Federal Trade Commission